AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**NORTHERN** _____ **DISTRICT OF** _____ **CALIFORNIA** _____

FILED
OCT 2 3 2007
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES OF AMERICA

**v.**

LAURO CORRAL

### CRIMINAL COMPLAINT

CASE NUMBER:

# 07-70619 WDB

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____March 8 and 20, 2007_____ in _____Contra Costa_____ county, in the _____Northern_____ District of _____California_____ defendant(s) did, (Track Statutory Language of Offense) knowingly and intentionally distribute methamphetamine, a Schedule II Controlled Substance,

in violation of Title _____21_____ United States Code, Section(s) _____841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(viii)_____ .

I further state that I am a(n) _____FBI Special Agent_____ and that this complaint is based on the following
                                                    Official Title

facts:

See Attached Affidavitt

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

Approved
As To
Form:                    _____
                          AUSA: GARTH HIRE

                                              _____
                                              Name/Signature of Complainant:

Sworn to before me and subscribed in my presence,

_____October 23, 2007_____  at     _____Oakland, California_____
Date                                                City and State

The Honorable Wayne D. Brazil
United States Magistrate Judge
_____                              _____
Name & Title of Judicial Officer                     Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

1  UNITED STATES DISTRICT COURT                    )
                                                    ) ss:
2  NORTHERN DISTRICT OF CALIFORNIA                 )

3

4                    **AFFIDAVIT IN SUPPORT OF COMPLAINT**

5          I, Doug Hunt, Special Agent of the Federal Bureau of Investigation, being duly sworn,

6  hereby declare as follows:

7  **I.      INTRODUCTION**

8          1.      I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and

9  have been so employed since October of 1995.  I am currently assigned to the Violent Crimes

10 and Major Offender Squad at the Oakland Resident Agency, San Francisco Field Office, where

11
   my responsibilities involve the investigation of gangs and narcotics trafficking.  During my

12 tenure in the FBI, I have been involved in numerous investigations of gang-related narcotics

13
   traffickers.  I have participated in physical and electronic surveillance and undercover narcotics

14
15 transactions, executed search warrants, and reviewed recorded countless conversations of drug

16 traffickers.  As a federal agent, I am authorized to investigate violations of laws of the United

17
   States and am a law enforcement officer with authority to execute warrants issued under the

18
19 authority of the United States.

20 **II.     PURPOSE OF AFFIDAVIT**

21
           2.      This affidavit is being submitted in support of a criminal complaint and arrest

22
23 warrant.  As set forth below, there is probable cause to believe that LAURO CORRAL has

24 violated 21 U.S.C. § 841(a)(1) (~~possession with intent to distribute a controlled substance~~).
                                    DISTRIBUTION OF A CONTROLLED SUBSTANCE DH

25
           3.      This affidavit is submitted for the limited purpose of securing the requested

26
27 complaint and arrest warrant, and therefore, I have not included each and every fact known to me

28 concerning this investigation.  I have set forth only the facts that I believe are necessary to

establish probable cause in support of this complaint.

## III.    PROBABLE CAUSE

### Criminal History of LAURO CORRAL

4.    On June 13, 2007, I reviewed the criminal history for LAURO CORRAL, which indicates that he has a 2002 conviction for distribution of marijuana in Kern County, a 2002 conviction for possession of narcotics for sale in Santa Clara County, and a 2003 misdemeanor conviction for providing false identification to a Peace Officer.    This criminal record also indicates that LAURO CORRAL has used two aliases when being arrested, including Felipe Figueroa Beltran and Ricardo Ibarra.    Furthermore, the criminal history also indicates LAURO CORRAL has an outstanding arrest warrant for a probation violation from Santa Clara County and an outstanding arrest warrant from Kern County for a narcotics violation.

### Background on CW-1

5.    In April, 2007, Detective Kenneth Westermann of the Contra Costa County Sheriff's Department told me that within the preceding several months, he had received information from a cooperating witness (hereafter referred to as "CW-1") concerning a methamphetamine supplier named "LAURO."    Detective Westermann has utilized CW-1 for approximately one year. Detective Westermann met CW-1 during a search of his/her residence in June, 2006, wherein approximately one quarter of a pound of methamphetamine was seized. Thereafter, CW-1 agreed to provide information and cooperate with the Contra Costa County Sheriffs's Office.    Since that time, Detective Westermann is not aware of any instances in which CW-1 has provided false information. Detective Westermann has previously used CW-1 in several different investigations, including a federal investigation involving narcotics trafficking

2

in Richmond, California. He was able to corroborate information provided by CW-1. In the past year, CW-1 has made controlled purchases of methamphetamine at the direction and under the supervision of Detective Westermann and myself. Information provided by CW-1 has led to arrests for burglary and robbery. Detective Westermann considers the information provided by CW-1 to be reliable.

6.    In June 2007, I met with CW-1 on approximately ten occasions. I have confirmed the information CW-1 has given me on those occasions. I am not aware of any occasion on which CW-1 has provided false information. Furthermore, I consider the information provided by CW-1 to be reliable. CW-1 is providing assistance on this and other related criminal matters in exchange for the payment of future relocation and related expenses by the FBI. Additionally, CW-1 has a potential pending charge resulting from a narcotics investigation by the Contra Costa County Sheriffs's Department. As mentioned previously, in that investigation, approximately one quarter of a pound of methamphetamine was located inside the residence of CW-1. No formal agreements have been made between the U.S. Attorney's Office or the District Attorney's Office and CW-1 regarding any resolution of these charges. Detective Westermann has advised CW-1, however, that so long as he/she provides truthful information, Detective Westermann will not seek charges based on the above-referenced conduct.

7.    I have reviewed CW-1's lengthy criminal history. CW-1 has arrests for narcotics trafficking, vehicle theft, battery, burglary, arson, criminal threats and weapons violations. CW-1 has criminal convictions for possession of a hypodermic needle, possession of a dangerous weapon, possession of a controlled substance for sale, receiving stolen property, felon in possession of a firearm, assault, and being under the influence of a controlled substance. CW-1 has admitted to me selling and using illegal narcotics.

3

**Information from CW-1 regarding "LAURO"**

8.      The purpose of the instant investigation was to use CW-1 to purchase methamphetamine from a person known to CW-1 as "LAURO." CW-1 has known LAURO for less than a year. CW-1 originally met LAURO during a methamphetamine transaction. LAURO came with a Hispanic male from Vallejo, California, who was providing CW-1 with methamphetamine. Since that meeting, CW-1 has purchased methamphetamine from LAURO approximately 50 times. CW-1 stated that he/she usually purchased quarter pound quantities of methamphetamine, but more recently has been purchasing an eighth of a pound quantities of methamphetamine. On one occasion, LAURO told CW-1 that he buys pound quantities of methamphetamine and breaks them up for sale. CW-1 stated that he/she usually meets LAURO at LAURO's sister's apartment on Pennsylvania Avenue in Richmond, California. CW-1 once was introduced to LAURO's sister and was told that her name was Sylvia. CW-1 described Sylvia as an attractive Hispanic female.

9.      During previous narcotics transactions, CW-1 contacted LAURO by telephone to arrange methamphetamine purchases. When CW-1 contacts LAURO by phone, it usually takes LAURO approximately 20 minutes to deliver the methamphetamine. On one occasion, LAURO sent another Hispanic male to deliver the methamphetamine, but on all other occasions, he delivered it himself. CW-1 indicated that LAURO drives several cars, including a Volkswagen Jetta, a Dodge Durango, and a Hummer. LAURO frequently changes his telephone numbers, but most recently they have been 510-776-7689 and 510-776-7760.

10.     In December 2007, Detective Westermann showed CW-1 a photograph from driver's license A7268750 of LAURO CORRAL, date of birth, January 19, 1973. CW-1 indicated that the person depicted in the driver's license photograph of LAURO CORRAL was the person CW-

4

1 knew as LAURO.

**Controlled sale of methamphetamine from LAURO to CW-1 on March 8, 2007**

11.    On March 8, 2007, at the direction of Detective Westermann, CW-1 conducted a controlled purchase of methamphetamine from CORRAL. I have reviewed all reports regarding this controlled purchase, including the surveillance report and CW-1's debrief, and have spoken with agents and detectives who participated in this operation. I have also reviewed the covert audio and video recording of this controlled purchase.

12.    Specifically, on March 8, 2007, at approximately 11:00 am, CW-1 placed a telephone call to LAURO CORRAL. During the call, CW-1 asked CORRAL for 3 ounces of methamphetamine. CORRAL replied that he had at least 2 ½, but would sell him/her 3 if he had it. They agreed to a price of $750 per ounce and $325 for the half ounce. CW-1 drove to an apartment complex at 1011 Pennsylvania Avenues in Richmond, California as instructed by LAURO. As stated previously, CW-1 indicated that he/she had met LAURO there many times to conduct narcotics transactions. CW-1 saw a yellow Hummer SUV that belongs to LAURO but did not see LAURO. Thereafter CW-1 indicated that he/she again called LAURO. LAURO told CW-1 he would be there in a few minutes.

13. Thereafter, a search of CW-1 was performed prior to the installation of a recording device on his/her person and CW-1's vehicle. CW-1 was provided with money and given instructions on how to conduct the transaction. At approximately 2:10 p.m., detectives and agents conducting surveillance for this controlled purchase of methamphetamine observed a Hispanic male wearing a red t-shirt exit 682 Fifth Street, Richmond, California, and enter a black Toyota Scion bearing dealer plates that was parked in front of the residence. The Hispanic male then pulled away from the residence as the sole occupant of the vehicle. At approximately 2:12

5

p.m., the black Toyota Scion bearing dealer plates arrived at the apartment complex at 1011

Pennsylvania Avenue, where CW-1 was waiting and pulled into the parking lot of the apartment

complex.   During this time, CORRAL's  yellow Hummer with California License number

5AQN547 was observed parked in the parking lot at 1011 Pennsylvania Avenue.  At

approximately 2:16 p.m. the black Toyota Scion bearing dealer plates exited the parking lot of

the apartment complex and turned toward Harbour Avenue.  At approximately 2:19 p.m. the

black Toyota Scion bearing dealer plates returned to 682 Fifth Street, Richmond, California. The

same Hispanic male observed earlier in the red T-shirt exited the vehicle and entered the

residence.  When surveillance officers were shown pictures of LAURO CORRAL, they indicated

the person depicted in the driver's license photograph appeared to be the same individual driving

the Toyota Scion.

        14.  CW-1 was debriefed after the transaction.  According to CW-1, LAURO arrived at

the apartment complex at 1011 Pennsylvania Avenue in a station wagon.   LAURO and the CW-

1 went into the laundry room of the apartment complex.  LAURO gave CW-1 approximately 1

ounce, ½ ounce, and 1/8 ounce of methamphetamine in separate baggies in exchange for $975.

LAURO told CW-1 that was all of the methamphetamine he had but would be going to Los

Angeles that evening to get another load.  At approximately 2:30 p.m., three baggies containing

suspected methamphetamine were recovered from CW-1.  CW-1 was again searched  for money,

weapons, and other contraband with negative results.  The baggies and suspected

methamphetamine were placed into evidence at the Contra Costa County Sheriff's Department.

        15.     I have reviewed the covert audio and video recording of the above-described

transaction.  The video recording depicts a Hispanic male arriving at the agreed-upon residence

in a black Toyota Scion.   The Hispanic male and CW-1 then enter the laundry room of the

6

apartment building.   The Hispanic male and CW-1 negotiate how much is to be paid for

methamphetamine.   Thereafter, the Hispanic Male can be seen receiving cash from CW-1.   Later

the video depicts CW-1  returning to his/her vehicle, returning to the staging area and speaking

with agents as they recover the recording equipment and baggies containing the white crystalline

substance.

16.     I have reviewed the Department of Motor Vehicles (DMV) driver's license

photograph for LAURO CORRAL.   I believe the person depicted in the driver's license

photograph of CORRAL is the same individual who can be seen selling the methamphetamine to

CW-1 in the covert video recording.

## Controlled sale of methamphetamine from LAURO to CW-1 on March 20, 2007

17.     On March 20, 2007, CW-1 placed a consensually monitored and recorded

telephone call to 510-776-7689.   In this phone call, CW-1 and a male who CW-1 indicated was

LAURO CORRAL exchanged greetings.   Thereafter,  CW-1 inquired if there was a shortage,

meaning a shortage of methamphetamine.   CORRAL indicated there was and that a lot of the

people he had been calling did not have any.   CW-1 then asked CORRAL if he had "good shit"

or if it was "mediocre."   CORRAL replied that it was "good good good good."   CW-1 then

asked if he/she could get a discount on the price.   CORRAL asked CW-1 "how many you want to

get?"   CW-1 indicated that he/she wanted to get four [ounces of methamphetamine].   CORRAL

indicated that he would charge "29" [$2,900].   CORRAL and CW-1 then arranged to meet in 20

minutes.

18.     Thereafter, a search of CW-1 was performed prior to the installation of a

recording device on his/her person and CW-1's vehicle.   Surveillance was initiated around the

location where CORRAL delivered methamphetamine to CW-1.   CW-1 was provided with

7

Contra Costa County cash funds to purchase methamphetamine and given instructions on how to conduct the transaction. The meeting was also recorded with audio and visual recording equipment. For this transaction, CW-1 was provided with $2,900 and given specific directions on how to conduct the meeting. Approximately 20 minutes later, agents and officers conducting surveillance observed CW-1 meeting with LAURO CORRAL in a small parking lot near 1011 Pennsylvania Avenue in Richmond, California.

19. Following the transaction, CW-1 was debriefed. According to CW-1, CORRAL got into CW-1's car and placed a plastic baggy of methamphetamine on the floor on the driver's side of the vehicle. CW-1 counted out $2,900 and gave it to CORRAL. CW-1 noticed that CORRAL had a paper bag and asked CORRAL what was in the bag. CORRAL said that it was "his." CORRAL showed CW-1 what was in the bag. CW-1 indicated that inside the paper bag was a plastic bag containing approximately one pound of methamphetamine in addition to the four ounces CW-1 was purchasing. A short time later, a plastic baggy containing approximately four ounces of suspected methamphetamine were recovered from the CW-1. CW-1 was again searched for money, weapons, and additional contraband with negative results. The plastic baggy of suspected methamphetamine was placed into evidence at the Contra Costa County Sheriff's Department.

**DEA Lab results regarding methamphetamine purchased from LAURO CORRAL on March 8, 2007 and March 20, 2007**

20. On June 4, 2007, I reviewed Drug Enforcement Laboratory Results for the suspected methamphetamine purchased from LAURO CORRAL on March 20, 2007. A DEA report dated April 24, 2007, exhibit number 1B4, indicates that the narcotics purchased from LAURO CORRAL tested positive for methamphetamine with a net weight of 110.5 grams, gross weight of 148.0 grams, and purity of 85.9%. The amount of actual drug found was 94.9

grams with a reserve weight of 109.5 grams. This DEA report also indicates exhibit number 1B5, which represents the narcotics purchased from LAURO CORRAL on March 8th, 2007. Exhibit number 1B5 tested positive for methamphetamine with a net weight of 45.3 grams, gross weight of 80.2 grams, and purity of 96.3%. The amount of actual drug found was 43.6 grams with a reserve weight of 44.4 grams.

## VI.    CONCLUSION

21.    For the reason stated above, I believe there is probable cause to support a complaint and arrest warrant for violations of 21 U.S.C. § 841(a)(1) (distribution of a controlled substance). I therefore respectfully request that the Court issue the requested Complaint.

DOUG HUNT
Special Agent, Federal Bureau of Investigation

Sworn to before me this
23rd day of October, 2007

HONORABLE WAYNE D. BRAZIL
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT**
**PENALTY SHEET**

***UNITED STATES v. LAURO CORRAL***

**COUNT ONE: MARCH 8, 2007**
**21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)**

<u>*If 851 Information alleging prior felony narcotics conviction FILED*</u>:

Imprisonment:          Maximum Life Imprisonment
                       Mandatory Minimum 20 Years Imprisonment or
                       Mandatory Life Imprisonment

Fine:                  Maximum $8,000,000

Supervised Release:    Maximum Lifetime Supervised Release
                       Mandatory Minimum 10-Year Term of Supervised Release

Special Assessment:    $100

<u>*If No 851 Information alleging prior felony narcotics conviction NOT FILED*</u>:

Imprisonment:          Maximum Life Imprisonment
                       Mandatory Minimum 10 Years Imprisonment

Fine:                  Maximum $4,000,000

Supervised Release:    Maximum Lifetime Supervised Release
                       Mandatory Minimum 5-Year Term of Supervised Release

Special Assessment:    $100

**COUNT TWO: MARCH 20, 2007**
**21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)**

<u>*If 851 Information alleging prior felony narcotics conviction FILED*</u>:

Imprisonment:          Maximum Life Imprisonment
                       Mandatory Minimum 10 Years Imprisonment

Page 1 of 2

Fine:                        Maximum $4,000,000

Supervised Release:          Maximum Lifetime Supervised Release
                             Mandatory Minimum 8-Year Term of Supervised Release

Special Assessment:          $100

*If No 851 Information alleging prior felony narcotics conviction NOT FILED:*

Imprisonment:                Maximum 40 Years Imprisonment
                             Mandatory Minimum 5 Years Imprisonment

Fine:                        Maximum $2,000,000

Supervised Release:          Maximum Lifetime Supervised Release
                             Mandatory Minimum 4-Year Term of Supervised Release

Special Assessment:          $100